1093 Pharma Resources v. Roxane Laboratories Well, at the very least, we can recognize that we have highly experienced counsel before us. We're ready to hear your argument, sir. Good morning, Your Honor. I'm pleased to support Edgar Howard for the appellant for Plainage for Pharmaceutical Resources. As the Court is aware, this is an appeal from the summary judgment decision of invalidity of the claims in suit as to two patents for lack of enablement under Section 35 U.S.C. 112. And I think it may be helpful to the Court if I could very briefly explain the invention as it relates to the prior argument, because I think it cuts through many of the arguments that are being made here on this appeal. Namely, that this is about, it's a pharmaceutical composition in which a steroid, in this case, majestro acetate, is combined with a number of other ingredients, surfactant, wetting agent. And this steroid is used to treat AIDS patients. The steroid has great difficulty being solubilized, namely it's insoluble, and that's why you need these surfactants and wetting agents. Counsel, I'm just going to jump right into my questions. I'm worried your time is going to run out and I won't get them out. Okay. Please. Thank you. The claims are just incredibly broad. A lot of your brief I construed as argument about your three examples and how they enable. And I absolutely agree with you, and I don't think the District Court disagreed. I don't think the District Court suggested a complete and utter lack of enablement. I think that his focus, or her focus, I'm not sure, was on the breadth of the claims. I mean, you would agree, right, that enablement has to exist for the breadth of claims. These are the broadest claims I could possibly imagine, except for the donut hole that is Atzinger's. I certainly agree. I'm sorry. Go ahead. I certainly agree that there are broad claims. I don't know that they're the broadest claims I could imagine. With regard to this invention. Go ahead. How many surfactants are there out there in the known chemical world that are pharmaceutically usable? I think there are 20 some odd that are listed in the USP. Is your claim in any way limited to that? Is your claim in any way limited to the 24 surfactants listed? No. So there are at least 24 surfactants that would be candidates. In fact, there would be hundreds that are candidates. There are 24 that are listed in a recommendation. Hundreds. Maybe, would thousands be appropriate, or would hundreds be more appropriate? Professor Kumar says in her report that she's the one that says that one of ordinary skill in the art, and that's the key here, is how would these claims be looked at by one of ordinary skill in the art, a formulator? How would he or she look at these claims and this art? And what Professor Kumar said is they would see this universe of surfactants that are very well known in the pharmaceutical industry, and they would specifically maybe go to the USP, US Pharmacopeia, or the National Formulary, where they say what are suitable pharmaceutical surfactants. And that's what one of ordinary skill in the art would probably start and look at those. Are there other ones? Of course there are other ones. The key to this invention is what one of ordinary skill in the art understands here. The prior art before Atzinger, which was the key piece of prior art, that was the Bristol-Meyers patent. The prior art before Atzinger was Nash, which is cited in the patent specification, that you could have a surfactant from .05% to .5%. It's a narrow range. No one's ever talking that these claims could have a surfactant in 20, 30, 40%. The prior art says when you have a surfactant that you're using with a steroid, which is what Majestica asked, it's more than .5%. Now you're just getting into the concentration argument, as opposed to the number of surfactants. I'm just trying to think, because that's just a whole different dimension upon which the claims could be construed broadly, because there's no concentration limitation. But the raw number of surfactants, it's just so large, and then you have a number of wetting agents, and it just gives such an enormous population to choose from. There are four wetting agents that you can use, as specified in the claims. On the surfactant side, we also have to appreciate the claim is a claim directed to an oral composition, an oral pharmaceutical formulation, that forms a stable flocculation suspension. Is that a claim limitation? It's got to be an oral pharmaceutical formulation. Am I just understanding you to say that the preamble is a claim limitation in this case? Yes, I think so. So it has to be a compound, ultimately, that is useful in treating AIDS patients? Yes. Therefore, it has to have at least three months stability? No. That is an FDA requirement that it may have to have, but that is really a dependent answer, because the three months stability, which does appear in a number of the claims in the 318 pact itself. Some of the claims are limited by that three months stability limitation, and others are not. However, the FDA requires bioavailability, bioequivalence, and that does not necessarily mean three months stability. It depends on the drug that you're talking about, it depends on the dosage form, it depends on the method of administration, so on and so forth. Are you suggesting there's no timing component to the word stability? And do we have to construe, I assume, this term in order to possibly reach a conclusion about the Femia, Femia, am I saying his name right? Femia, sorry. Femia? Yes. Okay. We have to reach a conclusion about whether it's three of seven or seven of seven requires an understanding of what the word stable means in the claim, because he clearly delineates between long-term stability, i.e. longer than three months, and short-term stability, I guess, is the way he sort of delineates it in his testimony. Because your contention is the district court got it wrong when they said only three of seven, in fact, all seven of his were stable, right? I think the Femia testimony is extrinsic evidence, and so to the extent it's extrinsic evidence, I don't think you should look at it for purposes of claim construction. And in fact, down below, Judge Debo was, he didn't. No, no, I'm not meaning to suggest we look at this for purposes of claim construction, but you want us to look at this for purposes of enablement. And how we interpret Mr. Femia's testimony depends on whether the word stable means three months or longer. The problem with the Femia testimony is I'm not expecting this court to look at that testimony and make a decision on whether or not you agree or disagree with the arguments that are being made here. That's the whole point here. This is a summary judgment. The judge down below did that, and I think that's one of the errors that he made. What he did is he looked at this testimony of Femia. He also looked at the Chow testimony, which is another inventor, and he interpreted it the way Roxanne urged that he should. But he made a determination that this is what the testimony is, and this is what it means, and therefore as a matter of law, it supports a non-enablement position because I'm finding that from this testimony, there are inoperative formulations. Counsel, he didn't interpret the testimony. I mean, there's no need for interpretation. The testimony is unequivocally clear. I mean, that doesn't involve a matter of interpretation. 3 of 7 worked, i.e., 4 of 7 didn't work if you're looking for three months or longer stability. 7 of 7 worked if stability is instantaneous as a concept. I mean, that part of the Femia testimony I don't understand to be an interpretation issue or in dispute in any way. I respectfully disagree because, first off, that testimony comes from not this lawsuit. It comes from the prior lawsuit where Mr. Femia was being asked about the research and development of PAR vis-a-vis the axing of PAR. But this is your evidence to avoid summary judgment of non-enfranchisement, isn't it? No. This is the evidence that you rely upon to argue on appeal, isn't it, that there's a disputed issue of fact here? Yes, it is. It is disputed. It's disputed, well, first off, to answer your question, this testimony by Mr. Femia is talking about an axinger patent comparing the PAR formulations with the axinger patent. In this case, we've also cited the testimony from Mr. Femia where he clearly explains that testimony. And he said, this is on page 181, it's actually in the appendix at A421. The one thing you need to recall, the definition of stability was always versus the brand product. If it appeared as flocculated as the brand product, it was deemed stable. If it was less flocculated, but still flocculated, it would still be deemed less stable, but not necessarily unstable. I'm sorry, what are you reading from? I'm reading from the deposition transcript. This is on A421. Deposition transcript of who? I'm hoping that you can read what you have in your appendix. Oh, by the way, these appendices were absolutely horrendous. I mean, I had to, I'm not old and I had to pull out my magnifying glass to figure out what some of this stuff says. I am older, and I definitely had to do that, and I apologize sincerely to the court for that. It's on page 181 of the deposition transcript. It's in the upper left-hand corner. It should be A421 in the appendix. In any event, what he's doing here is, inventor Femia is explaining what he was saying in that prior deposition, which is what you were inquiring about. And he's saying that I was The claims, of course, in this case, Claim 19 and Claim 41, do not have a stability limitation of three months. That, of course, is an argument that Roxanne is making in this appeal. But they say stable. Yes. So stable for how long? Three seconds? Three weeks? Three days? Your Honor, again, it's an oral pharmaceutical formulation. If it's three seconds, it is useless. It's not going to do anything for anyone. Counsel, is there anything in the spec that lends insight into the definition of the word stable? You need us to define this claim term in order to figure out the breadth of this claim and to consider your evidence and whether it creates a dispute of fact. So is there anything in the specification that you think ought to inform our consideration? There's no definition of the word stable. Let me give you a little help. Column 2, line 49. I have a brilliant law clerk that brought this to my attention. And she said, look here. Concentrations, as indicated, are not stable in that deflocculation and caking occur. Would that possibly support your argument that stability could be instantaneous? It's not certainly what I would think the ordinary meaning of the word would be. That is, I believe, how the word stable was defined and looked at by the district court and urged by us mainly to prevent deflocculation or caking. Whether that takes one month, one week, or six months, I don't know. It depends on the context. In the context of what this invention is addressed to and the specification discussion of the disease and the need to get nutrition and stimulate appetite into these seriously ill patients, so you're talking about a large population of patients in the United States who need this assistance during their treatment. And so you're talking about something that Can stability in that context mean anything less than three months? What measurement can there be for a successful treatment, which is what this invention purports to be, for this problem, if you have stability that lasts for something less than the shelf life that is expected? The answer to that is twofold. One is, how would the FDA answer that? Namely, is this an approvable product that is safe and efficacious for patient administration? Namely, if it's only stable for a month, could that be enough? I think there are probably drugs where the answer is yes, but I don't know them. I'm not an expert in that. All I'm trying to say, Ron, is I'm trying to not answer your question. It requires an FDA-based answer on the particular drug, what you're doing with it. And similarly, there's a commercial answer. When you say shelf life, shelf life is not three months. Shelf life could be two years. And quite frankly, there are patents... So that suggests that perhaps stability should be judged in the range of three months to two years. If it's put in the context of what would be a commercially viable product that has a shelf life of two years, then the answer is yes. There are many patents that claim just that. They claim a shelf life of two years. But counsel, we've got to decide it in this case. We've got to construe this word stability, and you're not giving us any help. I mean, how do we define the word stability? Are you suggesting there's no timing component to it whatsoever? The chief asked you that, and I didn't get your answer. I think there is no timing component on it. Then how could it be stable? Look, the claim cramble says a stable flocculated suspension. So clearly, if it's flocculated, that doesn't define stable, right? That can't be, because otherwise those two words would be redundant. Stable has to imply flocculated for some period of time. How else could we construe it? Stable, I think Your Honor pointed to one part of the specification that does answer the question. Flocculated meaning it's stable as long as it is in the flocculated suspension state. Once it becomes deflocculated, meaning that it settles down in the cakes so you can no longer use this solution, it's no longer stable. That's what stable really means here. And for purposes, I mean, it's dangerous, I think, to mix apples and oranges when we're talking about what's required for commercial purposes with the FDA versus what's required under the patent. No, I'm referring to your own specification and the problem that you're attempting to address with this invention. Right. Clearly, your specification talks in terms of three months, and you have dependent claims that focus in on the 40 degrees Celsius, 75% humidity, three months. And so I could imagine from a claim differentiation standpoint, you're going to suggest to me therefore claim 19 should not be limited that way, right? Correct. Is that what you're saying? But then I just don't know how to read the word stable. I mean, because it seems to me it's redundant if it simply means flocculated. It doesn't. Well, it means the suspension doesn't deflocculate. It doesn't start to fall apart. One could look at it as saying it starts to turn color. But it doesn't deflocculate. Once it deflocculates, it's finished. In other words, the patient can't use it anymore. It's sitting in the medicine cabinet. It's sitting in the bottom of the thing. When you shake it, nothing happens. It's gone. It's finished. It's deflocculated. That would be unstable at that point. All I'm saying is within the context of these patents, there is no time limit. It doesn't have to be three months. The 45 degrees, 75% relative humidity for three months is a well-known, kind of state-of-the-art measurement for stability in this area when people are filing for drug approvals. It doesn't mean that it – you know, most of these drugs are far more stable in three months, obviously. So one skilled in the art would understand in reading the word stable. To them, it would be meaningful in terms of three months. If the claim, Your Honor, if the claim said a commercial formulation of magistral acetate or it had a limitation as to the shelf life, the usable shelf life, or if it had some other limitation like that, the answer to your question would be absolutely correct, yes. But those limitations are not in these claims. They're not in all these claims. And this invention was the discovery that axanthin, the piece of prior art, was wrong in what it said you had to do to make a stable flocculating suspension of magistral acetate. And you proved it was wrong by being able to recreate that effect with one other surficant. Proved it by using other surfactants, yes, and also using other wetting engines and using them in completely different concentration ranges outside of the specified ranges of the prior art atzinger. In other words, below and above. That's really the key here. And quite frankly, once Carr did this, so did a lot of other people in the industry. And so that was the discovery, is that what atzinger said was the problem in the prior art. Namely, you could not use more than a certain amount of surfactant with a steroidal compound. That's what atzinger said to the patent office, and that's how they got their patent, to a particular surfactant with a particular wetting agent at a particular concentration. Carr, in designing around that patent, discovered through their R&D that that was not the case. Let me just make sure I understand. And that's what they disclosed to the public. Because I've made you spend so much of your time on claim construction. I'm going to let it go. I'm sorry. With the Chief's indulgence, let me make sure I just understand that the evidence that you say creates the dispute effect, okay, it's the two declarations, expert reports that were filed. Okay, but the problem I have with those is having looked at them, it's incredibly conclusory what they say. Let's quickly just look at, they don't give any detail. They reach a very conclusory conclusion. Look at the one on page A268 of your appendix. The only testimony at all that Dr. Pramar presents with regard to this issue appears, as I understand it, really in paragraph 14 where she just says, or he, she, he, which? She. Okay, where she just says, it would not be undue experimentation, period. Correct. That's all she says. There's no analysis. There's no articulation of how one would come to it quickly. Professor Pramar, paragraph 9 on A267, talks about pharmaceutical formulators rely on compounds whose standards are adopted by the U.S. pharmacopeia, etc. That's where the basis for the statement, the argument about one of skill in the art, would immediately look at, well, maybe first or early on, would look at what is known in the industry to use, namely what's in the USP and the national formula. And the point here of Professor Pramar is that, that her opinion is that one of ordinary skill in the art would be looking at those things and would know what surfactants to try. Would you know which surfactant works before you, before you experiment with it? It depends how much experience they have, I suppose. But, but I think that is really the key to Professor Pramar's expert report. Similarly with Professor Klebanoff, who was the other one, he talks about, in quite detail, about Parr's discovery and its R&D efforts to determine that you could have anionic, cationic, non-ionic surfactants, long-chain, short-chain. All of those were discoveries that Parr made after Atzinger was out there as part of R&D. That's what he's talking about. And so, so really the questions of fact that I believe the district court decided, I mean, I'm not, you know, obviously the district court had views of how he viewed this evidence, but that's not what this appeal is about. The appeal here is whether or not it was appropriate and proper to make a legal finding of non-enablement based on these factual assumptions and findings that I believe the district court made. All right, let's hear from the other side. Mr. Hussain. If, with the court's permission, I'd like to just address the points that were raised by the panel, and if there are any other questions, I'll be happy to answer them. First, I'd just like to mention that there's no support in the record for the fact that other people came into the market copying what Parr did. The reality shows, the evidence shows, that everybody after Atzinger came out with their invention, all the generics wanted to come in and make a generic, and they all did the same thing. Counsel, there are two expert reports here that say it would not require undue experimentation. Point to the 24 listed surfactants. There is Dr. Femia's testimony that in his belief, basically, or not in his belief, but that seven of all seven that he tried were in fact stable, if we interpret the claim term stable the way an appellant would like us to. So, I mean, that's a lot of evidence for the district court to say as a matter of law there's no disputed issue of fact on whether or not undue experimentation is required. Your Honor, firstly, regarding the declarations, as you pointed out, and I think as we made the exact same point in our briefs, these declarations are conclusory. They simply say somebody would look at it and they would know how to do it. With respect, for example, to the going to the... Somebody would look at it and they would know how to do it. Well, what exactly is the test for undue experimentation then? Because if somebody would look at the patent claim and know how to do this, then there isn't undue experimentation. So why wouldn't that be enough? Because you have to take into account on the facts of this case exactly what the intrinsic record tells us about whether you can do it or not. And I don't think an expert can simply say, oh, well, despite all of what that says, you can absolutely do it. And by that I specifically mean the specification in this case says, and I'm reading now from column three of the 318 patent on page 839 at the bottom, it says, the surfactants in a stable flocculated suspension need to be selected carefully and used within a critical concentration range because even minor changes can have an effect on the properties of such a stable formulation. This is particularly true for majestural acetate, and that's the active here, because predictability based on prior teachings does not apply. So the authors are telling you, in their effort to avoid an obvious misrejection, that hey, we have a completely unpredictable regime here. There's no way you can predict what's going to happen if you change the amount of the surfactant. And by the way, it's got to be used in some critical concentration range, but that's unpredictable. You make a slight change, you go to a different surfactant, we don't know what's going to happen. Now, do they tell us what's going to happen? Is there guidance as to how to go about finding what's going to happen? The argument, by the way, that a person of ordinary skill, I think it's in Dr. Kumar's declaration that you brought up, Your Honor, that you would go to the 24 surfactants in the USP because those are suitable for oral pharmaceutical formulations, again, look at the specification. And by the way, below, my opposing counsel specifically argued that there is no limitation on the type of surfactant that can be used in the claims. And I honestly don't believe him to be saying anything different here. I think he's conceding that. But I don't see how you can flip-flop back on those two points. The law is that the enablement must be reasonably commensurate with the full scope of the claim. The full scope of the claim encompasses any surfactant. I don't think anybody disputes that. Yeah, but it doesn't have to necessarily enable for every possible variation. I mean, I agree. It's really broad, and there's a lot of possible combinations, but, you know, I'm not one of ordinary skill in the art. And if one of ordinary skill in the art can focus in on the combinations that make sense, for example, maybe they've never put this wetting agent with this surfactant because it's known in the art bad things would happen, I don't know, because I'm not one of skill in the art. But one of skill in the art could make those sort of determinations. And the same thing with regard to concentration. I mean, why haven't they at least raised a genuine issue of fact? I don't think that raises a genuine issue of fact. Firstly, you know, in the spec, by the way, when they list all the surfactants, and they tell you the ones, if you look at the beginning of each sentence where they have these laundry lists of surfactants, it says, quote, column 4, line 32, suitable cationic surfactants are, laundry list. Column 4, line 15, suitable anionic surfactants are, laundry list. Column 4, line 30, suitable non-ionic surfactants are, laundry list. Every surfactant they identify in the spec, which, as you pointed out, and it's true, it's literally hundreds and hundreds, but several of these are genuses of compounds, are identified as suitable for the invention. And if you're going to claim that, if you want to cover the waterfront and stop everybody else from trying anything else, you've got to give a corresponding enabling disclosure. And this does not come close to doing that. Now, not only with respect to the identification of the surfactant, but one of your authors pointed out that there's a separate basis. There's no identification in these broad claims of any range limitation on these surfactants. And Dr. Klimanoff, the other expert report that the, excuse me, declaration that they put in to create a quote-unquote issue of fact, he specifically says that you wouldn't go reading the spec beyond .03, .03 percent surfactant, because above that you're going to get problems of caking. He says that. He tells us that. That's a person of ordinary skill. He's opining on that. But then isn't he saying one of ordinary skill would know not to do that and therefore it's not necessary for the spec to tell you not to do that. It's not necessary for the spec to say, don't go above point whatever, because one of skill in the art knows not to do that. And that satisfies or could arguably satisfy enabling, because this is summary judgment. I don't agree. I don't agree for two reasons. One, firstly, if the spec is clear, as Dr. Klimanoff is telling it is, that you can't go above .03. The spec says it's unpredictable. It's a critical concentration range. How can you then put in a claim that prevents anybody from ever trying to find out if there's a way to go above what you found to be the limit of .03? And isn't that directly analogous to the court's ruling in the A.K. Steele case? And also in the Inouye Fisher case, where they said, look, if you're teaching away, if you're telling us there's a range outside of which this doesn't work, we're not going to let you claim that. You can't stop everybody else from practicing beyond what your contribution is to the art. And that's exactly what's happened here. They're trying to cover the waterfront, block everybody else, as you started this argument today. These are incredibly broad claims. They block competition. They block other generics from coming out. What they want to do, obviously, is be in the market by themselves with Bristol Myers Good, who has the brand name product, so that they can keep the price up high and stop everybody else from using any other way to create a suspension. You can't cancel that part. It's not really relevant to what we have to figure out. Do you agree that we need to interpret the word stable? No, I don't think you have to, but I think it helps my position if you do. And I want to be clear on that. I don't think they can rely on experiments from their notebooks to support and enable a disclosure. The case law seems pretty clear that on the issue of enablement, for enablement, you have to show that the experimentation that you're relying on is in the specs only. I can rely on it to show that they have inoperative embodiments. That's different. But the law seems to be clear that there's that demarcation. They've got to rely on what's in their spec to show enablement. But why? Why? Why can't they show? Look, we did an experiment. Our lab notebooks show that we chose seven different combinations of surfactants and wetting agents and all of them resulted in stability, as the way we define stability, and why wouldn't that be evidence that might create a question of fact with regard to the scope of their enablement? Well, I believe you're right. First of all, even if... It seems relevant. I mean, it doesn't seem like it's irrelevant evidence. So where is this demarcation that you say exists? Well, I have specific reference to the Genentech case, Novo Nordics. It's 108 F3rd 1361, and they have a note there, a footnote for I believe it's on page 1368 of the case, and they discuss evidence that's put forward by the patentee, and they make the point, quote, but none of the necessary experimentation is described in the specification, which is where it should be if it is to contribute to an enabling disclosure. And the court seems to say that if you're going to rely on something, it has to be in the spec. If you're going to rely on something to claim you need this disclosure, but what about the fact that somebody tried... Okay, so suppose it wasn't Dr. Femia. Suppose it was you all. Suppose there was evidence in your client's lab notebooks which was discovered during discovery, that you randomly tried 25 different surfactants and wetting agents, and every one of them worked and met the definition of stable, whatever that is. Are you suggesting that evidence would be irrelevant for determining whether the specification is enabling? I don't think that would be relevant to whether the specification is enabling. But why? Isn't the... Because the specification doesn't provide the guidance of how to go about finding what the correct concentrations are. You only have to provide the guidance if... to not provide it would result in undue experimentation. And if there is sufficient extrinsic evidence that there wouldn't be undue experimentation, because the experimentation readily brought you to the answer, why doesn't that bring us back to the idea that spec is enabling? Because again, I believe it again. I don't think it matters which way you decide that question. I don't think it affects the outcome of the case one bit. But I don't believe, based on my understanding that you can supplement the disclosure of the specification to show that you've enabled the full scope of the claim by going to experiments that are hidden in your notebook and even today are unknown to the public. The public has no knowledge. Those documents are still confidential. Has no idea what they did, how they did it, how they achieved that. And as the court pointed out, the district court, excuse me, in its opinion below, that PAR took, by its own admission, several months to come up even with its own one commercial environment. So no one knows how that was achieved. But can I speak just briefly to the question of stability that you raised during the argument earlier? Let's not lose sight of the fact that the whole point of this invention is not the idea of just slapping together a surfactant and a wetting agent and putting it together with majestural acetate. That was known. As the patent here and the spec point out, the whole point is to be able, the art is to create a stable flocculated suspension. Anybody can put the things together and stay stable. And of course you're right that there's got to be some limitation on what stable means. It can't mean two seconds. That makes absolutely no sense. Now here, I must tell you that what I think the district court judge did and I think he was correct to do it, he basically in a way hung them by their own batard and said, look, you're saying it has no meaning. I'll go along with that. I agree that that's the correct claim construction here. I happen to personally disagree. But the judge said, I find that that's the case. And since you're saying it can mean anything, it's got to also be stable for three months. And you haven't shown that. And so the FEMIA testimony becomes relevant and therefore it shows they were failed experiments. That's what I think he did. I don't think he was out of his mind and concluded that it has no limitation and then he found the FEMIA experiments were relevant. Of course he concluded that since it has no limitation, it's got to be stable for some reason. But the reality is, Your Honors, is that I believe that the prosecution history establishes beyond doubt here what stable means. Firstly, Your Honor pointed to something in column two, but there's a clear statement in column four of the specification where the patent talks specifically about suspension stability. And it identifies that very test of the three months uh, is it column four? I may have misspoke on the column. I'm sorry. It's example four in column seven. My apologies. Under the heading, suspension stability. Yeah, but this is one of the embodiments, multiple embodiments. I mean, that's not a definition of the word stability. That is maybe a further limitation of the word stability. A lot of dependent claims, but I don't see how we can extrapolate from that definition. I was going to go a little further. Okay, good. Bring me further. Okay. Let me bring you a little further. Then during the prosecution of the first application, the 241 application, the very first application in the chain, they go through the application. It gets rejected on 112 and 103. Respond. Make all the arguments. They point out it's unpredictable. They reiterate that. Any change in types or amounts of ingredient, unpredictable. Same rejection from the examiner. Then they come back and they amend the claims in that patent to limit it to a very narrow concentration range, and most of the claims were limited to the specific suspension stability, but not all of them. The specific suspension stability in example four. And they get that patent, and of course they have a suit us on that patent because we don't infringe that patent. And now they say in their remarks to the examiner, and I quote from page A301, in amending the claims to obtain their liability, they say, surprisingly, the present invention provides for a stable flocculated suspension, and again, the present invention, no specific reference to a claim, of magestral acetate by using different ingredients than atzinger. And then there's a parenthetical, not using polysorbate and PEG simultaneously in the same composition. The donut that Your Honor mentioned. Then they go on to say, and I quote, the stability of the suspension of the present invention is described on page 13 of the specification as the ability of the ability to, excuse me, ability to be redispersed after being allowed to settle at 40 degrees centigrade and 75% relative humidity for a period of three months. Now this court has said, when you talk in your prosecution as to whether the present invention makes broad sweeping statements, you're going to be stuck with that. You're bound by that. And in the L.K. case, Okay, hold on. I'm just a little bit confused about where you are. I'm sorry. And it's kind of hard to read, but on 301, it says, in response applicants is here, an amended claim, I assume that's one, it might be three, I can't tell, and that's when it says about the limitation of 40 degrees and 75. Is there another place where they're making this in regard to the invention generally? I believe this, no, there is not, Your Honor, but I believe this statement I've read is about the invention generally. It says, it calls out claim, I believe it's one, it might be three, I can't read the number, but it calls out a particular claim and then and it says this claim was amended to include this limitation so I don't see how you extrapolate from that that they were giving it up with regard to the invention generally. Because I think they clearly say in the present invention, and by the way in the paragraph right above where you're looking at, they point that the examiner rejected claims 1 to 22 as they are there talking about generally all the claims. Then they do talk about the amendment they claim, which of course is logical because that's the only amended claim, but then the next paragraph I don't see how it can be read as anything that's talking about the invention. The entire invention. And again, if it doesn't mean that, what does it mean? What does stable mean? As one of Your Honors pointed out, it's got to mean something, and it can't be that all I have to do is formulate and see that it's stable for, you know, three seconds, five seconds, ten minutes. That's not anything that's not useful. It wouldn't be beneficial in any way. Is there evidence about ordinary skill in the art how they would interpret the word stable? Was there any such evidence? It'd probably be useful in this case. I believe that in this case the parties relied on the intrinsic record in supporting their arguments. I don't want to speak for my opposing counsel, but on our side I believe we did. All right, thank you. You only have a minute. You only have a minute. The question about whether or not PAR can rely on experiments outside of the specification for purposes of establishing enablement, I think the answer is yes. I would cite the Atlas Power case, which is cited on page 10 of our brief. And again, Your Honor, it's about the determinations that were made by the district court in order to get to the finding of non-enablement. That's what we're appealing here. That's what we think is error, regardless of how this court ultimately would look at that same evidence or even the judge down below has a trial if this court sets the case back down. Did you all, just so I know, is there any extrinsic evidence about stable? Any experts that said stable means to me blank? I don't believe so, because I think the Markman hearing that we had in this case did not include experts. And so there weren't any experts that occurred in connection with the Markman. There was oral argument I think to that effect, but even there I would have to go back and look at the records. That's a shame. I could see it being helpful. I'm sorry. All right. We thank all counsel. We'll take this appeal under advisement.